**GARCIA v. QUIROZ et al.**

No. 11985.

Court of Civil Appeals of Texas.
San Antonio.

Feb. 8, 1950.

Rehearing Denied April 5, 1950.

Russell M. Brown, Corpus Christi, Mc-Campbell, Wood & Kirkham, Corpus Christi, for appellant.

R. Briscoe King, Corpus Christi, Leo N. Duran, Corpus Christi, Lyman & Pittman, Corpus Christi, L. Hamilton Lowe, Austin, for appellees.

NORVELL, Justice.

By this suit, Fred Garcia sought a declaratory judgment establishing his status as the adopted son of Federico and Guadalupe Quiroz. Guadalupe Quiroz died in 1936. In 1942 Federico Quiroz was adjudged insane and Juanita Quiroz, his second wife, was appointed guardian of his estate. In addition to Juanita Quiroz, an alleged half-brother and sister of Federico Quiroz and persons alleged to be descendants of other half brothers and sisters were made parties. A guardian ad litem was also appointed for the person and estate of Federico Quiroz.

Trial was to a jury and judgment rendered against Fred Garcia, who brings the case here. No brief has been filed on behalf of Juanita Quiroz, nor on behalf of an alleged half-brother of Federico Quiroz, as said brother filed a disclaimer in the court below. The other defendants as appellees have filed briefs containing counter points and cross assignments of error.

This is primarily a fact case. The question is one of "adoption by estoppel" and the law of this State upon the subject seems fairly settled and clearly stated in two leading Supreme Court opinions in the cases of Cubley v. Barbee, 123 Tex. 411, 73 S.W.2d 72, by Chief Justice Cureton, and Jones v. Guy, 135 Tex. 398, 143 S.W. 2d 906, 142 A.L.R. 77, by Associate Justice Slatton. These opinions contain numerous citations of authorities and the problem here is the application of the rules announced in said opinions to the particular facts of this case.

Before an examination of the jury findings, the following preliminary statement may be helpful:

When Guadalupe married Federico Quiros she had two children by former marriages, Juan Cantu and Conrado Garcia. Fred Garcia, the appellant, was a grandson of Guadalupe Quiroz, being the first-born son of Conrado and his wife, Jesusa. No children were born to the marriage of Federico and Guadalupe Quiroz, and Fred Garcia lived with his grandparents until the death of his grandmother in 1936, and thereafter continued to live with Federico Quiroz until November of 1941, when he was inducted into the Marine Corps.

Although it is conceded that the statute relating to adoptions was not complied with, it is appellant's contention that his grandmother and her husband had taken custody and control of him as an infant, under an arrangement with his natural parents whereby Federico and Guadalupe Quiroz agreed to adopt him; that he had fully and completely performed all of the duties and obligations resting upon him as an adopted child of said Federico and Guadalupe Quiroz, and that as a result the said Federico Quiroz and all those standing in privity with him and his deceased wife, Guadalupe Quiroz, were and are estopped to deny that the appellant, Fred Garcia, was and is the adopted child of the said Federico and Guadalupe Quiroz.

Appellant here contends that he was entitled to judgment upon the jury's verdict considered in the light of the undisputed evidence.

The jury findings, insofar as pertinent to the appeal, are as follows:

Special Issue No. One:

Do you find, from a preponderance of the evidence that Federico Quiroz, n.c.m., and his wife, Guadalupe, about the year 1925 agreed with Conrado and Jesusa Garcia to adopt Fred Garcia as their own son? Answer: Yes.

Special Issue No. Two:

Do you find, from a preponderance of the evidence, that Federico Quiroz, n.c.m., and his wife, Guadalupe, jointly treated, reared, and cared for Fred Garcia from his infancy until they were incapacitated by either death or insanity, as if he had been their own son? Answer: Yes.

Special Issue No. Three:

Do you find, from a preponderance of the evidence, that the plaintiff, Fred Garcia, rendered to Federico Quiroz, n.c.m., and wife, Guadalupe, the love, obedience, affection, and duties of a child and son from his infancy to the present time? Answer: Yes.

Special Issue No. Four:

Do you find, from a preponderance of the evidence, that Conrado and Jesusa Garcia about the year 1925, permanently gave up and surrendered to Federico Quiroz, n.c.m., and his wife, Guadalupe, their parental control and custody of Fred Garcia *and did not thereafter exercise the same?* Answer: No.

Special Issue No. Four-A:

Do you find, from a preponderance of the evidence that Federico Quiroz, n.c.m., ever exercised any parental control and custody of and over Fred Garcia? Answer: Yes.

Special Issue No. Four-B:

Do you find, from a preponderance of the evidence, that Federico Quiroz, n.c.m., exercised complete parental control and custody of and over Fred Garcia continuously, exclusively and without interruption from and without interruption from anyone from about 1925 up to the time of his insanity, if you have found that he ever exercised such control and custody? Answer: No.

Special Issue No. Four-C:

Do you find from a preponderance of the evidence, that Guadalupe Quiroz ever exercised any parental control and custody of and over Fred Garcia? Answer: Yes.

Special Issue No. Four-D:

Do you find from a preponderance of the evidence, that Guadalupe Quiroz exercised complete parental control and custody of and over Fred Garcia continuously, exclusively, and without interruption from anyone from about 1925 up to the time of the death of said Guadalupe Quiroz, if you have found that she ever exercised such control and custody? Answer: Yes.

The trial court concluded that appellees were entitled to judgment by reason of the jury's answers to Special Issues Nos. Four and Four-B, and granted appellees' motion for judgment. In addition to asserting that this action of the court was correct, the appellees contend that they were entitled to judgment as a matter of law and consequently their motion for an instructed verdict should have been granted. By cross-assignments of error, appellees also attack the sufficiency of the evidence in law and in fact to support the jury's answers to Special Issues Nos. 1, 2, 3 and 4-D. The conflicting contentions of the parties necessitate a review of the evidence, aggregating, with exhibits, some 1,000 pages, included in five volumes of a well-prepared narrative statement of facts, made up by Earl E. Carter, official court reporter of the 117th Judicial District, in compliance with the provisions of Rule 380, T.R.C.P.

The statutory provisions in force at the time of the asserted adoption of appellant in this case (1925) were Articles 42, 43 and 44 of the 1925 Revised Statutes, Articles 1 to 6, inclusive, of the 1911 Revised Statutes. These Articles are as follows:

"Art. 42. (1) Mode of adoption. Any person wishing to adopt another as his legal heir shall file in the office of the county clerk of the county in which he resides a written statement signed by him and duly authenticated or acknowledged as deeds are required to be, reciting in substance that he adopts the person named therein as his

legal heir, and the same shall be admitted to record in said office.

"Art. 43. (2–5) Rights of adopted heir. —When such statement is so recorded it shall entitle any child so adopted to all the rights and privileges, both in law and equity, of a legal heir of the adoptive parent, as a child has by law against lawful parents. If the adoptive parent has at the time of such adoption or shall thereafter have, a child begotten in lawful wedlock, such adopted heir shall in no case inherit more than one-fourth of the estate of the adoptive parent.

"Art. 44. (3-4-6) Authority transferred. —The parent or parents of a child who is to be so adopted may, by an instrument in writing duly signed and authenticated or acknowledged as deeds are required to be, transfer their parental authority and custody over such child to the adoptive parent. Where the lawful parent or parents have voluntarily abandoned such child and left it to the care of others for a period of at least three years, or voluntarily left it to be cared for by charity for a period of at least three years, and such child shall be so adopted, such parent or parents shall be held to have transferred their parental authority and custody over said child to the adoptive parent; and in all such cases such lawful parents shall thereafter be barred from exercising any authority, control or custody over the person or estate of such child as against the adoptive parent. No adoptive parent shall transfer his authority and custody to any other person."

As no written statement was signed and authenticated by Federico and Guadalupe Quiroz, the question of the existence of an "adoption by estoppel" is presented. We state the applicable rule by paraphrasing an A. L. R. annotation approved in Cubley v. Barbee, 123 Tex. 411, 73 S.W. 2d 72, and Jones v. Guy, 135 Tex. 398, 143 S.W.2d 906, 142 A.L.R. 77, as follows:

■ A court of equity will sustain an estoppel in pais to preclude adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations induced such performance under the belief of the existence of the status of adopted child. In re Taggart's Estate, 190 Cal. 493, 213 P. 504, 27 A.L.R. 1365.

The persons involved in the transactions and occurrences giving rise to this litigation are either Mexican nationals or Spanish speaking Americans. The fact that to them the English language is not a wholly familiar medium of expression is indicated by the statement of facts. It is also apparent that the customs of these people vary in certain respects from those generally followed by the English speaking population of the State. There is direct testimony to that effect. One noticeable feature of behavior indicated by the record is the seemingly unkindly and unfriendly conduct of one person toward another, followed immediately by the resumption of friendly and apparently harmonious relationships. This is true particularly of the behavior of Conrado Garcia towards Federico Quiroz, and there is a suggestion of this element in the history of the relationship between Quiroz and his alleged foster son, who is the appellant here.

It appears that Conrado Garcia was provided for and reared from early childhood by his mother, Guadalupe, and his stepfather, Federico Quiroz. Even after Conrado became grown and had married, Federico continued to support him and his family. On November 1, 1924, the appellant was born in Corpus Christi, Texas. His parents were Conrado Garcia and his wife, Jesusa. His birth certificate gave his name as Fred Garcia and he was baptized in the Roman Catholic Faith under that name. It appears that shortly after baptism, he was also confirmed in the Roman Catholic Church, in accordance with the custom and usage prevailing among Spanish speaking Americans in South Texas at that time. It is not entirely clear whether he was confirmed as Fred Garcia or Fred Quiroz.

There is testimony coming primarily from Conrado and Jesusa Garcia, that shortly after appellant's birth his mother, Jesusa, again became pregnant. Guadalupe

and Federico Quiroz had no children of their own, and this was a source of great disappointment to them. In 1925, Federico Quiroz was the owner of a bakery and a man of property, while Conrado and his wife were in straitened financial circumstances. Because of these considerations it was agreed that Federico and Guadalupe Quiroz would take Fred Garcia as their child, adopt him and treat him as their own offspring, and exercise parental control over him.

Fred Garcia, then an infant, was taken into the Quiroz home and, although thereafter Federico continued to assist Conrado in supporting his family, which continued to increase in numbers, there was a marked difference between the relationship existing between Federico and appellant, on the one hand, and the other children of Conrado, on the other hand. At least from the time appellant started to school, he went by the name of Quiroz rather than by his baptismal name of Garcia.

It appears that the jury's answer to Special Issue No. 2, insofar as it relates to joint care of and control over appellant by Federico and Guadalupe Quiroz, is abundantly supported by the evidence. As long as Guadalupe was alive the relationship between her and appellant was seemingly that of mother and son, insofar as control, love and affection and mutual duties were concerned.

After Guadalupe's death in 1936, the appellant continued to make his home with Federico and was supported by him. Conrado and his brother brought a suit against Federico trying to set aside the last will and testament of Guadalupe Quiroz in which Federico was designated as the principal beneficiary. See Quiroz v. Cantu, Tex.Civ.App., 119 S.W.2d 568, 569. The litigation was settled by Federico's paying to Conrado Garcia and Juan Cantu the sum of $15,000. However, this lawsuit seems to have made very little difference in the relationship existing between Federico and Conrado's family, and young Fred continued to live with and was supported by Federico Quiroz.

Special Issues Nos. 4 and 4-B and the answers thereto are relied upon to support the court's judgment. As we see the record, the jury's answers to these issues are supported by the undisputed evidence, and the question presented is whether or not these undisputed circumstances prevent an adoption by estoppel from arising.

Conrado and Jesusa Garcia undoubtedly exercised parental control over appellant in connection with his enlistment in the Marine Corps. It also appears that Jesusa gave her consent to appellant's marriage, which took place during his minority but after Federico Quiroz had been adjudicated insane. As to the circumstances which led to appellant's enlistment in the Marine Corps, it appears that during the fall of 1941 some trouble developed between appellant and Federico. As neither of the principals could testify as to the matter, the details thereof are rather vague and two conflicting versions thereof are suggested by the evidence. One is, that appellant had been spoiled by Federico, who provided him with practically everything he desired, and that upon one occasion appellant became displeased with Federico because of his refusal to buy an automobile for him. The other version of the trouble is, that after Guadalupe's death, and particularly during the year 1941, Federico began drinking heavily; that upon numerous occasions it became necessary for appellant to take Federico home from places where intoxicating liquor was served, and that upon one such occasion when appellant attempted to take Federico home, he, Federico, became enraged at appellant because he had embarrassed him in the presence of some lady friends who were present at the time.

However that may be, it appears that Conrado Garcia, probably at the instigation of Federico, went before the County Attorney of Nueces County and swore out a complaint charging that appellant was an incorrigible child who wandered about the streets at night unattended and was a delinquent child.

As a result of these proceedings, the County Judge of Nueces County suggested

that the boy enlist in the United States Marine Corps. This suggestion was carried out and during the course of preparing the necessary papers, the enlisting agency of the Marine Corps requested the consent of the parents. As the birth certificate showed appellant to be the son of Conrado and Jesusa Garcia, their written consent to enlistment was secured. The act undoubtedly constituted the exercise of parental control over the boy. Appellant was accepted into the Marine Corps under the name appearing on the birth certificate, that is, Fred Garcia.

While the matter of the enlistment was pending, appellant continued to live with Federico Quiroz, and when he left Corpus Christi to report to the Marine training barracks, Federico purchased a new suit of clothes and other accessories for him. Whatever the difference between the two might have been, they apparently became fully reconciled and their normal relationships were resumed.

This enlistment took place in November of 1941, and after the attack on Pearl Harbor and the consequent employment of the military forces of the United States, Federico expressed to certain witnesses his deep concern over the safety of appellant and referred to him as his son or boy.

Certain letters written by appellant to both his natural parents and to Federico appear in the statement of facts. He used the term "father and mother" in referring to his natural parents and also used the term "father" in writing to Federico.

In 1942, Federico was adjudged a person of unsound mind. When appellant was honorably discharged after service with the First Marine Division in the South Pacific and returned home, Federico was hopelessly insane and confined to an institution and a guardian had been appointed for his estate.

We first consider the contention, evidently accepted by the trial court in rendering judgment, that appellant cannot recover as prayed for because of the jury's answers to Special Issues Nos. Four and Four-B, above set out.

■ The articles of the statute above set out require a transfer of parental authority from the natural parents to the adoptive parents. The important question involved is whether or not there was actually such a transfer made. In the absence of an instrument in writing, as contemplated by the statute, the actions of the natural parents constitute evidence of the actual agreement made at the time of the purported adoption. There was direct evidence of an oral adoption agreement and a transfer of parental custody and control. The subsequent assertion of authority over the child by the natural parents in one or two isolated instances occurring long after the agreement was made, cannot be considered as substantial evidence that no transfer of parental custody or control had taken place, nor can it be contended that such exercise of parental authority by the natural parents would destroy the adoption or have any particular bearing upon the issue of estoppel. In the instances involved here, the assertions of parental authority by appellant's natural parents were made to comply with legal requirements and rules adopted by agencies of the United States government and the State of Texas (consent to marriage) and were in no way antagonistic to the purported status of Federico Quiroz as a foster father. The facts of this case differ greatly from those disclosed in the opinion in the case of Price v. Price, Tex.Civ.App., 217 S.W.2d 905 (relied upon by appellees), wherein it appeared that the mother of the child involved had refused from the beginning to relinquish the custody of her child and refused to enter into a contract of adoption.

■ We conclude that in the light of the undisputed evidence, the jury's answers to Special Issues Nos. 4 and 4B did not preclude the rendition of judgment in appellant's favor based upon the jury's verdict and findings.

We next consider the contention that the judgment should not be reversed because appellees were entitled to an instructed verdict. This seems to be appellees' primary contention, and it is argued with

much force that as adoption was unknown at common law and the Legislature has provided a statutory method for effecting an adoption, public policy demands that the facts forming the basis of an estoppel, must be established by clear and satisfactory proof. It is contended that the case is analogous to one involving the statute of frauds. See Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216; Ben H. Powell, Jr. Adoption, Agreement to Adopt, 17 Tex.Law Review 389.

It is also urged that as the testimony relating to the actual agreement of adoption came from Conrado and Jesusa Garcia, the natural parents of appellant, it should be regarded with suspicion, especially in view of the fact that when Conrado and his half brother, Juan Cantu, contested the probation of a will purportedly executed by Guadalupe Quiroz, they represented themselves to be the only heirs of their mother and made no representation that Fred Garcia was an adopted child of Guadalupe Quiroz. While this circumstance might tend to throw some doubt upon Conrado's testimony, the asserted existence of an adoption agreement does not rest alone upon the testimony of appellant's natural parents. School teachers, members of Catholic religious orders, neighbors, grocers, storekeepers and others testified that Fred Garcia lived with Federico Quiroz, apparently as a son and was treated as such. School reports and grades were introduced in evidence showing that appellant was known for years by the school authorities as Fred Quiroz. A photostatic copy of a life insurance policy, issued by the Kansas City Life Insurance Company to Federico Quiroz was introduced in evidence. It bore an endorsement, dated August 16, 1939, whereby the beneficiary was changed from "Guadalupe Cantu Quiroz, my wife, to Juanita V. Gonzales, sister, one-half and Federico Quiroz, Jr., adopted son, one-half."

Instances might be multiplied for, as above pointed out, the record is long and detailed. We think, however, that the following statement from one of appellant's briefs is fairly applicable to the evidentiary situation presented: "Any true relationship of adoption extending over a period of time is bound to leave indelible tracks and signs in the community. School records and insurance policies bearing the adoptive name and relationship are made, and contract with trades people, friends, neighbors, schoolmates, doctors, nurses— all leave their mark. Once the relationship is fixed, those in contact with the family necessarily become acquainted with the facts of the relationship. * * * Any child living under one roof in a community for long necessarily brings on constant daily deeds, acts, declarations and conduct of the parties, which either reflect and admit the existence of the relationship or deny it."

It is our opinion that the evidence sustains the jury's findings upon which the ultimate conclusion of estoppel rests, and that the evidence further meets the full and satisfactory test.

It is suggested that no estoppel should arise in appellant's favor because of the "clean hands" doctrine in that the evidence indicates that appellant failed to carry out his obligations as a son to his foster father. By its answer to Special Issue No. 3, the jury found that appellant rendered to Federico and Guadalupe Quiroz the love, obedience, affection and duties of a child and son. Appellees are in effect asserting that the jury's finding in this particular has no support in the evidence. This contention is largely predicated upon the events which immediately preceded appellant's enlistment in the Marine Corps, and, as heretofore pointed out, the evidence as to these occurrences is far from clear. There is evidence that appellant over a period of years treated his alleged foster parents with apparent love and affection. Federico Quiroz may have been an overly kind and indulgent man. The record suggests that he was. He seems, however, to have maintained and cherished a fatherly feeling and consideration for appellant until his mind became weakened and it became necessary for him to receive institutional care. It is strongly indicated that at the time of the last parting between

appellant and his alleged foster father, the latter had forgiven the wrongs, if any, which he had suffered from appellant, and regarded him with affectionate and fatherly interest. There was no attempted repudiation of the father and son relationship by Federico Quiroz, and in view of this circumstance and evidence of a long continued father and son relationship, we cannot say that the jury's answer to Special Issue No. 3 is without support in the evidence. It cannot be said as a matter of law or would support a finding that appellant failed to discharge his duties to his foster father so that he could not in good conscience claim his status as an adopted son.

In addition to the matters above discussed which are raised by appellees' counter-points and their first nine cross-assignment of error, appellees raise certain other contentions which will be briefly noticed.

■ We hold that Conrado and Jesusa Garcia were not disqualified from testifying by the provisions of Article 3716, Vernon's Ann.Civ.Stats. At the time of the trial, the appellant had obtained his majority. His natural parents were under no legal duty to support him. They had disclaimed all interest in any estate that Fred Garcia might possibly acquire as an heir of Federico Quiroz, which was obviously a legally non-existent interest. The mere fact that they would like to see their natural son prevail in this lawsuit would not render their testimony inadmissible. Ragsdale v. Ragsdale, 142 Tex. 476, 179 S.W.2d 291.

■ The trial court did not err in overruling appellees' motion for new trial because of an improper question propounded to appellant by his counsel. The question was never answered. The court promptly instructed the jury not to consider the question. The asking of the question was not entirely unprovoked by appellees.

■ The claim as to a defect of parties is unfounded in fact. The plea raising the matter was (insofar as the record shows) never called to the attention of the court and a ruling invoked thereon. It appears that the will of Guadalupe Quiroz has long

been probated and her estate fully administered. Federico Quiroz was the principal beneficiary of said estate, and he, his guardian, and his collateral heirs were parties to this suit. The appointment of a guardian for Federico Quiroz in his capacity as "independent executor of the estate of Guadalupe Quiroz, deceased," was a patent anomaly, but, nevertheless, a harmless procedure.

Appellees' objections to the court's charge brought forward by cross-assignments are not well taken and are overruled.

For the reasons stated, the judgment of the trial court is reversed and such decree as the lower court should have rendered will be ordered by this Court. It is accordingly decreed that appellant, Fred Garcia, was and is the adopted son of Federico and Guadalupe Quiroz, in accordance with the provisions of Articles 42–44, inclusive, 1925 Revised Civil Statutes, and entitled to any and all legal rights incident to that status. Hoch v. Hoch, 140 Tex. 475, 168 S.W.2d 638.

Reversed and rendered.