Barney MALONE et al., Appellants,

v.

Ben DIXON, Appellee.

No. 4111.

Court of Civil Appeals of Texas.

Eastland.

Dec. 16, 1966.

Rehearing Denied Jan. 13, 1967.

Jones, Fillmore, Robinson & Lambert, Wichita Falls, Thomas F. Glover, Seymour, for appellant.

Fillmore & Fillmore, Wichita Falls, R. J. Balch, Clyde Whitesides, Seymour, for appellee.

COLLINGS, Justice.

Ben Dixon brought suit in the County Court of Baylor County seeking a judgment declaring him to be the adopted son of Marenda J. Gist, deceased, by estoppel. Defendants were Barney Malone and other collateral heirs of the said Marenda J. Gist. Judgment was rendered in the County Court adverse to plaintiff's claim and he appealed to the District Court. After a trial before a jury, judgment was rendered in the District Court decreeing Ben Dixon to be the adopted son of Marenda J. Gist, deceased, by estoppel and the sole and only heir entitled to inherit all of her estate. The defendants have appealed.

Appellee, Dixon, alleged that W. J. Gist and wife Marenda Gist entered into an agreement with Rev. I. Z. T. Morris, which agreement was partly oral and partly in writing during the later part of 1912 or 1913 whereby Mr. and Mrs. Gist agreed to adopt appellee. W. J. Gist died in October of 1930.

The jury found that (1) during the year 1913, W. J. Gist and wife Marenda Gist agreed with Rev. I. Z. T. Morris that they would adopt Ben Dixon, (2) that Ben Dixon relied upon such agreement of the Gists to adopt him, (3) that Dixon in relying upon such agreement performed his duties and responded in a manner consistent with the relationship of a child toward its parents, and (4) Mr. and Mrs. Gist from and after April of 1913, reared, cared for and treated Ben Dixon as a member of their family and as if he had been their own child.

Appellants present points contending that the court erred in overruling their motion for judgment non obstante veredicto in connection with special issues Nos. 1, 2 and 3, because there was no evidence to support such findings, that the evidence was insufficient to support such finding and that such findings are against the great weight and preponderance of the evidence. The following is a summary of a portion of the voluminous evidence material to a determination of appellants' points.

Ben Dixon was born in Dallas, Texas, and was seven years of age when his surviving parent, his mother, passed away. After his mother died he lived for about two years with an aunt and uncle in Dublin, Texas, and was then taken by his aunt to an orphans' home in Fort Worth, Texas, where he spent another two years. On one occasion during this two year period he was sent to a foster home in Gainesville but was returned to the home in Fort Worth after about three weeks. Sometime thereafter he was told by one of the matrons of the home that he was being sent to a new home; that he was placed on a train at the station in Fort Worth with a ticket to Wichita Falls. When he arrived at Wichita Falls he was met by Mrs. W. J. Gist and carried to the Gist home in the community of Shady, about ten miles from Seymour, Texas. At that time Ben Dixon was eleven years of age. Appellee Dixon testified that he was raised in the Gist home and resided there until he left to enter the armed services in 1920. He stated

that Reverend I. Z. T. Morris was connected with the orphans' home in Fort Worth; that about six months after he went to the home of the Gists he had a conversation with Reverend Morris who asked him how he liked his new home; and that he informed Reverend Morris that he liked his new home fine.

Mr. Sproesser Wynn, a Fort Worth attorney, testified that he had represented the orphan's home in question as general counsel since 1937 and that he is presently secretary of the corporation. Concerning the history of the home he stated that in about 1896 an unincorporated association was formed by some of the civic leaders in Fort Worth under the name of the Texas Children's Home and Aid Society; that this association was incorporated in 1904; that in 1950 its charter was amended changing the name to its present name which is the Edna Gladney Home. Mr. Wynn testified that in the beginning the superintendent of the home was Reverend I. Z. T. Morris, and that it was sometimes called the Morris Home; that after Mrs. Gladney became the superintendent in 1925, Reverend Morris retired and that the home was often thereafter referred to as the Gladney Home even before the name was officially changed.

Mr. Wynn stated that in his capacity as secretary of the home he had supervision and control of its records. He identified the W. J. Gist file, which was also designated on the label as "Cradle Name Ben Dixon." From this file several exhibits were marked and introduced into evidence. One of the exhibits was a letter dated November 1, 1912 from Mrs. W. J. Gist addressed to Reverend I. Z. T. Morris stating that she would like to get a healthy, intelligent orphan boy of about five or ten years of age. She further stated in the letter that "we are so situated as to give one a good opportunity to be somebody." Mrs. Gist stated in her letter that they lived close to a Methodist Church and that Reverend Joe McReynolds was the pastor of

the church. Another of the exhibits introduced was a letter from Mrs. Gist to Reverend I. Z. T. Morris dated April 15, 1913. This letter stated: "I can meet him in Wichita Falls and I will keep him the ninety days and if satisfactory we can have the papers fixed up." Mr. Wynn testified that he knew of no other papers that Mrs. Wynn could have had reference to in this letter other than adoption papers. Another of the exhibits introduced was a letter dated November 20, 1915 written by W. J. Gist and addressed to Reverend I. Z. T. Morris. This letter stated that "Ben, the boy we got from you" was getting along fine; that he was healthy and well satisfied, was being sent to school; that the boy would be educated, if he would take it, and that if he proved worthy he would be given a good start. The letter further stated that the family had gone to church and Sunday School every Sunday "that was fit" since the boy had been with them.

Mr. Wynn explained to the court and jury how formal adoptions were accomplished prior to 1931 and described how such procedure was reflected in the records of the orphan's home. He stated that in many of the files there was absolute proof of the adoption deed under the procedure prior to 1931; there was in some cases reference to or copies of, but no proof of the execution and filing of an adoption deed, and that in many other files there was nothing in the record of the home one way or the other.

Another of the exhibits introduced in evidence contains written conditions on the face of the application blank to obtain a child from the orphan's home in question. Mr. and Mrs. Gist signed such an application blank. Among the written conditions were:

"3. In no case shall a child be given away to the third party without the written consent of the Society.

4. Unless the child is legally adopted, foster parents will make reports when requested.

5. It is desired that the younger children shall be legally adopted; but Court papers cannot be taken out until the written consent of the Society is given * * *

Adoption papers will be furnished by the Society free of charge.

Dear Sir: We have carefully read the above conditions and signify our concurrence therein by making the following application."

Mr. Wynn further testified that there was no requirement that the foster parents adopt the children taken into their homes.

Another exhibit introduced into evidence was a letter from Ben Dixon's aunt dated January 13, 1919 addressed to the home inquiring about Ben Dixon and his whereabouts. Another exhibit was a memo made by the home in the Ben Dixon file dated November 17, 1932 stating "we are writing to the foster parents of the two children today", and another memo dated January 25, 1933 indicated that a Mrs. Faggard had been informed of the addresses of both Mary Frances and Ben Dixon. Another exhibit was a letter to the Gists from the superintendent of the home dated January 24, 1933 stating as follows:

"We appreciate the homes that our foster parents give these children and want always to carry out their wishes in a case like this; but since Ben was such a big boy when you took him, I am just taking it for granted that you would not object to him knowing his cousins, and have written him today. We would like to hear from you, as to how the boy got along at school and in your home."

■■■ Reverend Joe McReynolds testified by way of written interrogatories. He stated that he was pastor of the Methodist Church in the Shady Community during 1912 and '13; that he is now retired from the ministry and resides in Midland, Texas. He stated that he was well acquainted with Mr. and Mrs. Gist; that they lived close to the community of Shady and about half a mile from the church of which he was pastor; that he thought he had a conversation with the Gists about the adoption of a child but couldn't be sure about it, but did know that the Gists obtained a child from Reverend I. Z. T. Morris; that he knew Reverend Morris before, after and during the time in question; that he recommended Mr. and Mrs. Gist to Reverend Morris and participated in arranging for Ben Dixon to come and live with the Gists. Reverend McReynolds stated in answer to interrogatory No. 24 that Reverend Morris told him that Mr. & Mrs. Gist had agreed to adopt Ben Dixon. Appellants' 11th point complains of the introduction of interrogatory number 24 propounded to Reverend McReynolds and his affirmative answer thereto on the ground that it was hearsay. In our opinion no reversible error is presented in this point. The admission of the evidence complained of was harmless because it was cumulative. The existence of an agreement between Reverend Morris and the Gists that they would adopt the child Ben Dixon was fully established by properly admissible evidence. The evidence shows that the principle purpose of the home was to take orphan children and place them for adoption. Although the written application for a child provided by the home did not by its terms require an agreement to adopt it did plainly contemplate an adoption. The Gists signed this written application and in a letter to Reverend Morris stated they "would like to have this boy." There was positive testimony by two disinterested witnesses that Mrs. Gist stated to them that she and her husband had agreed to adopt the boy. Many circumstances in evidence are consistent with and tend to show an agreement to adopt. The admission of this cumulative evidence over appellants' objection did not constitute reversible error. Bridges v. City of Richardson, 163 Tex. 292, 354 S.W.2d 366; Highway Insurance Underwriters v. LeBeau, 184 S.W.2d 671 (Tex. Ct.Civ.App.), reversed on other grounds 143 Tex. 589, 187 S.W.2d 73; Lewis v. Bergess, 22 Tex.Civ.App. 252, 54 S.W. 609 (1899). In this connection Rev. McReynolds testi-

fied that he was well acquainted with Reverend Morris who represented the home and that he had participated in placing eight or ten children from the home. He stated, in effect, in answer to interrogatory number 27 that never to his knowledge had Reverend Morris permitted any of the children he had helped place to remain with the prospective parents unless they agreed to adopt the children. We overrule appellants' point number 10 which complains of the action of the court in overruling their objection to the admission of this interrogatory. The objection was waived because similar testimony was elicited by appellants from the witness on cross examination. It was harmless because cumulative.

Mrs. Ben Dixon, the wife of appellee testified that she was married to Ben Dixon in 1928 when he was working in Olney, Texas; that during the first years of their married life they lived in Olney. She stated that she and her husband frequently visited Mr. & Mrs. Gist after they were married and enjoyed a congenial relationship with them. She testified that on the occasion of her wedding to appellee on August 2, 1928 she observed Mr. and Mrs. Gist who were present and that Mr. Gist was emotionally upset and cried. Other witnesses also stated that Mr. Gist showed emotion at the wedding. Mrs. Dixon testified that after the death of Mr. Gist in 1930, she and her husband continued to visit with Mrs. Gist and enjoyed a close relationship; that she took it to be a relationship between a son and his mother; that on occasion she had heard Mrs. Gist introduce her husband Ben Dixon to people as her boy. She also heard Mrs. Gist refer to herself as grandmother to Ben Dixon's children. Mrs. Dixon also stated that at the request of Mrs. Gist the witness and her husband on several occasions left their regular employment and moved from other parts of the State to return to the home of Mrs. Gist to render services, care and attention required for her well-being; that on one occasion Mrs. Gist had some people on her farm who were leaving and that she

"wanted us to come back and take care of her cows and help with things on the farm." Mrs. Dixon stated that in compliance with Mrs. Gist's request they did go to her farm and helped with the work; that they milked seventeen cows night and morning; that her husband quit his job and moved to the farm with Mrs. Gist and remained there on that occasion for about two years. Mrs. Dixon testified that on three other occasions she and her husband at the request of Mrs. Gist came back to Mrs. Gist's farm to help her; that on each of these occasions Mr. Dixon was working somewhere else and quit his job to return and help Mrs. Gist with her cattle, stock and farm; that on these occasions she and her husband were not paid a salary; that Mrs. Gist lived with them on the farm and would buy the groceries; that sometimes she gave us the cream money. Mrs. Dixon further testified that she and her husband and their children spent the Christmas and Thanksgiving holiday seasons with Mrs. Gist either in appellee's home or in the home of Mrs. Gist. Mrs. Dixon further testified that during Mrs. Gist's declining years when her health began to fail that she and her husband continued to care for and administer to her needs. She testified that Mrs. Gist gave them the home in which they were living at the time of the trial; that she had the house built for them and also gave them a tractor and some cattle.

Mr. James Bernard Furr testified as a witness for appellee. He stated that he got acquainted with Ben Dixon while they were both working for a telephone company on a job at Benjamin, Texas; that during the time they worked together they would prior to appellee's marriage spend many of their off duty hours together; that they would sometimes spend the weekends in the home of Mr. and Mrs. Gist which was some 30 or 40 miles from the place where they were then working. Mr. Furr stated that on these occasions he and appellee would sometimes use the Gist family car and double date; that on numerous occasions he had opportunity to observe the relationship be-

tween appellee and Mr. and Mrs. Gist; that the relationship appeared to him to be a normal family relationship, that is a mother, father and son relationship. He stated that Mr. Gist, whom he referred to as Uncle Bill, would often come to the company warehouse and appeared to be greatly interested in Ben's well-being and had pride in his work. He stated that Mr. Gist was complimentary of Ben's work as a boy on the farm; that Mr. G. H. Williams was Ben's boss and it seemed to the witness that Mr. Gist was trying to build Ben up with his boss.

Mrs. G. H. Williams testified that she and her husband, who was the manager of the telephone company in question, came to Seymour in 1926. Mrs. Williams stated that she was associated with Mr. and Mrs. Gist and with Ben Dixon on numerous occasions. She stated that the relationship appeared to her to be the normal parent and son relationship; that "Uncle Bill" called Ben his boy. She stated that Ben Dixon and his wife were married in her home and that after the wedding she continued to visit the Gists and the Dixons quite often. She testified that Mrs. Gist once told her that she had made an agreement at the home to adopt Ben but never did get the papers signed. Mrs. Williams stated that Mrs. Gist told her that both she and Mr. Gist had agreed to adopt Ben.

Mrs. Estelle Slaggle testified as a witness for the plaintiff and stated that Mrs. Gist told her that she got Ben from a home in Forth Worth and that they made an agreement to adopt him but never did go through with it.

Mr. Bill Elliston, a funeral director in Seymour, testified that he was in charge of the arrangements for the funeral of Mrs. Gist; that in taking care of such arrangements he took a history from some of the appellants herein and that based upon the information given by such appellants Mr. Elliston listed Ben Dixon as "adopted son" of Mrs. Gist. The witness stated that prior to this conference with appellants he had never known or heard of Ben Dixon.

Several witnesses testified in behalf of the defendants. Mrs. Barney Malone, wife of one of the defendants, testified that in all of her close association with the Gists they never mentioned an agreement to adopt Ben Dixon; that in 1961 Mr. and Mrs. Ben Dixon came to them and Mrs. Dixon wanted Barney Malone to come and get Mrs. Gist out of their home. She stated that it was not the Dixon's place to take care of her, but was rather the responsibility of Barney Malone. She further testified that prior to giving the farm land to Ben Dixon Mrs. Gist had stated that if she didn't give him something he would not get anything because they didn't adopt him.

Mrs. Sam Henyan testified that in 1928 or 1929 Mrs. Gist told her that Ben Dixon was not an adopted son that she took him to raise and didn't intend to adopt him.

George Sizmore testified that Mr. and Mrs. Gist in 1927 stated in his presence that they had not adopted Ben Dixon, didn't intend to adopt him and that he was a problem child.

Mrs. Elsie Shepperd testified that she and her husband lived in Mrs. Gist's home from January 20, 1960 until February of 1962; that during this period of time Ben Dixon never visited with Mrs. Gist; that Mrs. Gist referred to Ben Dixon as her foster son and stated that she was not going to give him any more land because he hadn't done anything with the 113 acres she had already given him. Mrs. Shepperd further stated that sickness required her and her husband to leave town, and that Ben Dixon refused to keep Mrs. Gist stating that he was not obligated to keep her and that she should be taken to Barney Malone or Cletus Malone. Appellants' 12th point urges that the court erred in sustaining appellee's motion to strike all of the testimony of Mrs. Shepperd concerning statements and transactions of Mrs. Gist in her presence after Mrs. Gist

was placed under guardianship. The fact that Dixon refused to keep Mrs. Gist when she was old and in need of help and his disclaimer of responsibility was not evidence of the lack of an agreement on the part of the Gists to adopt him but it was relevant in that it showed his attitude and feeling about the mother. In our opinion, however, the striking of this testimony was not reversible error. The evidence was cumulative of other evidence which showed the existence of similar and even stranger facts and circumstances.

Kenneth Ray Olive testified that he was one of the owners of the Taylor Nursing Home in Wichita Falls; that Mrs. Gist was admitted to his rest home in August 1962; that the arrangement was made by her brothers, B. M. Malone and C. B. Malone, and that the latter was noted as her guardian; that Grady Ward and B. M. Malone were noted as interested parties to be notified; that Mrs. Gist died while in this rest home in 1964, and that Ben Dixon was never seen at the home nor were any letters or correspondence received from him during Mrs. Gist's stay at the home.

A joint will between W. J. Gist and Marenda Gist, executed February 6, 1930, was introduced in evidence. This will makes no mention of Ben Dixon. A deed from Mrs. Gist to Ben Dixon dated June 3, 1948 conveying certain lands refers to Ben Dixon as a "foster son." Another deed from Mrs. Gist to Ben Dixon dated March 26, 1948 also refers to the grantee Ben Dixon as "foster son."

■ The jury found and appellants do not question the fact that after Ben Dixon came to the home of Mr. and Mrs. Gist in 1913 they reared, cared for and treated him as a member of the family and as if he had been their own child. Appellants do question the findings in answer to special issues 1, 2 and 3 to the effect that the Gists agreed with Reverend Morris that they would adopt Ben Dixon, that Ben Dixon relied upon such agreement and responded in a manner consistent with the relationship of a child toward its parents. Where an adoption is claimed by estoppel because of an alleged agreement made prior to the death of adopted parents the agreement may be proved by the action, conduct and admissions of the parties and by other relevant facts and circumstances. Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972 (1951). Two witnesses testified that Mrs. Gist told them that she and Mr. Gist had agreed to adopt Ben Dixon. This constituted some evidence in support of the finding of an agreement to adopt. In addition there were facts and circumstances in evidence consistent with and tending to show an agreement to adopt. We overrule appellants' points contending that there was no evidence to support the findings to special issues 1, 2 and 3.

It is true that other facts and circumstances in substance as above set out are inconsistent with an agreement to adopt and tend to show that there was no such agreement. As pointed out by appellants none of the exhibits of the records and files of the home showed an agreement to adopt. However, such exhibits do not show that there was no agreement to adopt. Appellants particularly urge and emphasize the fact that Ben Dixon's name was never changed after he went to live with the Gists. It is true that this does not tend to support the findings of the jury but it is not necessarily inconsistent therewith. In any event it is only one of the facts and circumstances to be considered. Ben Dixon was eleven years old when he went to the home of Mr. and Mrs. Gist. Mr. Wynn who has represented the orphan's home for many years testified that when an older child is adopted he will frequently retain his own name.

Appellants further urge the fact that Mrs. Gist executed deeds to Ben Dixon in which he was referred to as a "foster son" and contend that this shows there was no agreement to adopt. This fact also is just one of the circumstances in evidence and is not conclusive on the question of an agreement to adopt.

Appellants urge that the finding of an agreement to adopt is wrong and cannot serve as a basis of judgment because, appellants contend, Reverend Morris did not have authority to enter into such an agreement to adopt. They insist that the written regulations of the home prohibited any contract to adopt unless the contract was in writing. The application does provide as follows: "It is desired that the younger children should be legally adopted but court papers cannot be taken out until the written consent of the Society is given." In the first place the provision by its terms applies to "younger children" and in addition there is no evidence one way or the other concerning whether written consent to adopt was furnished Mr. and Mrs. Gist. The testimony of Mr. Wynn indicates that many adoptions did occur during that period without any record of written consent.

As heretofore noted Ben Dixon was taken into the Gist home in 1913 when he was eleven years of age. He continued to reside in the home in an apparently normal parent and son relationship until he went into the Armed Forces in 1920. The evidence supports the conclusion that during that period Ben Dixon conducted himself in a normal dutiful manner of a son. After the death of Mr. Gist in 1930 appellant for many years continued such attitude and conduct toward Mrs. Gist. There was evidence both in favor of and against the findings of the jury in answer to special issues 1, 2 and 3. Based upon a consideration of the entire record we hold that the evidence is sufficient to support the findings of the jury in answer to special issues 1, 2 and 3 and that such findings are not against the great weight and preponderance of the evidence.

■ It is undisputed that there was no legal adoption. The question is whether the evidence and findings show an adoption by estoppel. In our opinion the elements of an adoption by estoppel are shown. It was shown that Mr. and Mrs. Gist agreed with Reverend Morris, who was acting for the benefit of the eleven year old Ben Dixon, that they would adopt him; that in pursuance with that agreement the Gists took Ben into their home and cared for him as they would a natural child and Ben Dixon in return rendered the duties and affections of a natural child to Mr. and Mrs. Gist. Cavanaugh v. Davis, supra; Bigleben v. Stevens, 262 S.W.2d 785, (Tex. Ct.Civ.App.1953), Ref. N.R.E.; Cubley v. Barbee, 123 Tex. 411, 73 S.W.2d 72 (1934); Albright v. Bouldin, 394 S.W.2d 681 (Tex. Ct.Civ.App.1965, N.R.E.); Garcia v. Quiroz, 228 S.W.2d 953 (Tex.Ct.Civ.App.1950, Ref. N. R. E.).

■ Appellants' points 13, 14 and 15 complain of the action of the court in refusing their requested special issues 4, 5 and 6 inquiring (4) whether the Texas Childrens' Home required written permission from the home prior to the adoption of a child taken therefrom, (5) whether the home authorized in writing any agreement between Reverend Morris and the Gists to adopt Ben Dixon and (6) whether the home ever relinquished its authority of Ben Dixon during the time he lived in the Gist home. Appellants contend that such requested issues are ultimate issues presenting a defensive theory of their case and that the court therefore erred in refusing to submit them. These points are overruled. The requested issues were evidentiary and not ultimate. It is undisputed that the home stood in loco parentis to Ben Dixon. It is likewise undisputed that Reverend I. Z. T. Morris was, at all times material, superintendent and agent of the home. In agreeing with the Gists that they would adopt the child, Ben Dixon, Reverend Morris was acting for the child's benefit. Both the Gists and appellants are estopped to deny the authority of Reverend Morris to represent the home in such an agreement.

The judgment is affirmed.