PLEASANT GLADE ASSEMBLY OF GOD, Reverend Lloyd A. McCutchen, Rod Linzay, Holly Linzay, Sandra Smith, Becky Bickel, and Paul Patterson, Appellants,

v.

Laura SCHUBERT, Appellee.

No. 2–02–264–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 15, 2005.

Law Office of David M. Pruessner, David M. Pruessner, Dallas, for Appellants.

Douglas, Wuester & Stenholm, P.C., William O. Wuester, Fort Worth, for Appellee.

PANEL A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

## OPINION ON REHEARING

JOHN CAYCE, Chief Justice.

### Introduction

This is an appeal from a judgment against Pleasant Glade Assembly of God church, two of its pastors, and several church members [1] based on a jury verdict in favor of a former church member, Laura Schubert, for assault and battery and false imprisonment. In ten issues, appellants assert they should not be held liable for Laura's damages because they were acting *in loco parentis* and as Good Samaritans. They also complain that the damages awarded by the jury were not foreseeable and that the trial court improperly admitted medical evidence concerning Laura's post-traumatic stress disorder (PTSD). Finally, appellants contend that the judgment should be reversed because there is no clear and convincing evidence, as required by the First Amendment, that they acted with malice.

We reverse and render in part and affirm in part.

### Factual and Procedural Background

On Saturday, June 8, 1996, Tom and Judy Schubert went out of town for a long weekend, leaving their three teenage children home alone. The Schuberts left their oldest child, nineteen-year-old Amy, in charge. While the Schuberts were away, their middle child, seventeen-year-old Laura, spent much of her time at the family's church, Pleasant Glade Assembly of God, participating in church-related activities. Laura collapsed following the evening service on Sunday, June 9, and several church members, including appellants, felt it necessary to physically restrain her. The evidence concerning the restraint and the events that followed is hotly contested.

The record shows that, after her collapse, Laura clenched her fists tightly, gritted her teeth, foamed at the mouth, made guttural noises, cried, yelled, kicked, sweated, and hallucinated. The parties sharply disagree, however, over whether these things were the cause, or the result, of appellants' attempts to restrain her. The parties also disagree over the amount of force used to restrain Laura and whether she was restrained for minutes or hours.

There is evidence that Laura's collapse and her reaction to being restrained could have been due to the medical condition hypoglycemia. Appellants did not know this at the time, however, and some of them believed that Laura's actions were a dramatic ploy for attention from members of the church's youth group. None of appellants sought medical attention for Laura, and there is conflicting evidence concerning whether any of them attempted to check her vital signs or determine whether she was feeling all right. Appellants testified at trial, however, that they had acted solely out of a desire to help Laura, not hurt her, and that they had no feelings of ill will or malice towards her.

Following the Sunday episode, the next two days passed uneventfully. Laura con-

---

1. Appellants are Pleasant Glade Assembly of God church, Reverend Lloyd A. McCutchen, Rod Linzay, Holly Linzay, Sandra Smith, Becky Bickel, and Paul Patterson.

tinued to participate in church-related activities, such as Vacation Bible School and preparing for youth drama productions. Tom and Judy Schubert returned home late Tuesday afternoon.

On Wednesday evening, Laura attended the church's weekly youth service. Rod Linzay, the church's youth pastor, was in charge of the service. At the close of the service, Laura began to act in a manner that Linzay and the youth group believed indicated that she was having another episode like that of the previous Sunday night. At some point, Laura began thrashing about on the floor. Once again, there is conflicting evidence about whether this was the cause or the result of appellants' attempts to restrain her, as well as about how long the restraint lasted and the amount of force used.

The church's senior pastor, Lloyd McCutchen, was summoned and told that "Laura is doing it again." [2] At the prompting of Gene Schacterle, a visiting pastor, McCutchen eventually telephoned Tom Schubert. Laura's parents drove to the church to get her, where they found her in a condition that Tom described as "dazed." They took Laura to a restaurant for a meal and then drove home. Both Laura and her parents testified that Laura suffered carpet burns, a scrape on her back, and bruises on her wrists and shoulders as a result of her experiences. Laura's parents did not, however, seek medical attention for her physical injuries.

By June 21, Laura had begun to experience nightmares about her experiences at the church. In late June 1996, she first visited a counselor. In addition, although Laura had been attending public school before the summer of 1996, she became anxious and left school on the first day of her senior year in August 1996. She was authorized to complete her senior year of high school at home. Also, while at work in late October 1996, Laura cut her wrists, although not badly, with a box cutter after seeing her overwhelming work schedule. She also reported that she had become depressed and suicidal because of the June 1996 events at the church.

In November 1996, Laura was first diagnosed as suffering from post-traumatic stress disorder (PTSD). By May 1997, several other doctors had also made this diagnosis and a diagnosis of acute stress disorder. Several of Laura's doctors testified at trial and opined that Laura's PTSD was caused by her being held down physically at the church in early June 1996.

Between the fall of 1996 and the time of trial, Laura saw many different counselors, psychologists, and psychiatrists and, on a number of occasions, was admitted to psychiatric institutions for several days. She suffered a variety of symptoms, including angry outbursts, weight loss, sleeplessness, nightmares, hallucinations, self-mutilation, fear of abandonment, and agoraphobia.[3] She was also classified as "disabled" by the Social Security Administration and began drawing a monthly disability check.

Laura eventually sued appellants for, among other things, assault and battery and false imprisonment. In defense to the suit, appellants claimed that they were immune from liability under the *in loco parentis* doctrine and because they acted as Good Samaritans. In addition, appellants contended that under the First Amendment to the United States Constitution

---

2. McCutchen had not been present during the Sunday evening episode, but had been told about it.

3. Agoraphobia is the abnormal fear of being helpless in an embarrassing or inescapable situation that is characterized by the avoidance of being in public places. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 24 (10th ed.1994).

and article I, section 6 of the Texas Constitution Laura should be required to prove by clear and convincing evidence that appellants acted with malice. Appellants also asserted that they should not be held responsible for Laura's damages because they were not foreseeable.

The case was tried to a jury. At the close of the evidence, appellants moved for a directed verdict on their defenses and on the ground that there was no evidence that Laura's damages arising from her PTSD were foreseeable as a result of appellants' conduct. The motion was overruled. Appellants then requested jury instructions on their defenses and on the question of foreseeability as it related to Laura's damages, all of which the trial court denied.

The jury found appellants liable for assault and battery and false imprisonment and awarded Laura damages for past physical pain and mental anguish in the sum of $150,000, past and future loss of earning capacity in the sum of $122,000, and past and future medical care in the sum of $28,000, for a total recovery of $300,000. After the trial court overruled appellants' motion for judgment notwithstanding the verdict, this appeal followed.

## In Loco Parentis

In their first issue, appellants complain that the trial court improperly denied their motions for a directed verdict and for judgment notwithstanding the verdict based on *in loco parentis*. They assert that they are immune from liability for Laura's assault and battery and false imprisonment claims because they stood *in loco parentis* as to Laura during the June 1996 incidents and acted with the "reasonable belief" that their actions were necessary to restrain her. In the alternative, appellants assert that the trial court erroneously refused to submit their proposed jury instruction on *in loco parentis*.

"*In loco parentis*" literally means "in the place of a parent" and refers to "acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent."[4] In Texas, *in loco parentis* status has been conferred on persons and entities who have voluntarily assumed parental responsibilities and attempted to create a home-like environment for the child.[5] "[O]ne who through kindness or charity or other motive has received into his family and treats a child as a member thereof, stands in loco parentis ... so long as the child remains in his family."[6] The defining

---

4. BLACK'S LAW DICTIONARY 803 (8th ed.1999).

5. *See McGee v. McGee*, 936 S.W.2d 360, 369–70 (Tex.App.-Waco 1996, writ denied) (op. on reh'g) (holding that stepfather stood *in loco parentis* because he had cared for child from early childhood and was the only father child had ever known); *Goetz v. Lutheran Social Serv. of Tex., Inc.*, 579 S.W.2d 82, 83 (Tex.Civ.App.-Austin 1979, no writ) (holding that children's home had *in loco parentis* status and appointing home as child's managing conservator after parental rights were terminated); *Malone v. Dixon*, 410 S.W.2d 278, 285 (Tex.Civ.App.-Eastland 1966, writ ref'd n.r.e.) (concluding that orphanage stood *in loco parentis* as to child after his aunt placed him there following his parents' death); *Trotter v.*

Pollan, 311 S.W.2d 723, 729 (Tex.Civ.App.-Dallas) (deeming couple *in loco parentis* to child who lived for years in their home with no financial assistance from child's father and whom they voluntarily cared for and treated as their own), *writ ref'd n.r.e. per curiam*, 158 Tex. 494, 313 S.W.2d 603 (1958); *Cantu v. S. Pac. Ry. Co.*, 166 S.W.2d 963, 965 (Tex.Civ.App.-Amarillo 1942, writ ref'd) (holding couple stood *in loco parentis* to child whose parents had committed to couple child's care, custody, and child-rearing responsibilities from age 15 months until child's death ten years later).

6. *Trotter*, 311 S.W.2d at 729; *accord McGee*, 936 S.W.2d at 369.

characteristics of *in loco parentis* are the actual care and custody of a child by a nonparent who assumes parental duties because the parent—generally due to his or her absence—is unable or unwilling to care for the child.[7] A person who has only a temporary responsibility for supervising a child, however, is not deemed to be *in loco parentis* as to the child.[8]

■ In this case, appellants assert that they stood *in loco parentis* as to Laura on the occasions in question because Tom and Judy Schubert had entrusted them with Laura's care while the Schuberts were out of town; the church's youth pastor, Rod Linzay, and his wife Holly, regularly "played a parental role with respect to the youth group"; and other church members assumed parental responsibilities for Laura, which Tom Schubert testified that he expected. These are, however, merely temporary supervisory situations; they are not the types of circumstances that give rise to the *in loco parentis* status.[9]

Further, the record shows that Laura was primarily responsible for her own care and was not in the custody of anyone in particular while the Schuberts were out of town. Although Laura's parents left Amy "in charge" and also expected Laura to spend much of her time at the church, Laura was responsible for her own meals and getting herself to and from her retail job and church-related activities. She also stayed at night in her own home, sometimes with a friend, unsupervised by any adults. Thus, the defining characteristics of *in loco parentis*—actual care and custody—are not present in this case.[10]

■ The authorities on which appellants rely are inapposite because they involve either the teacher-pupil relationship[11] or defenses to criminal prosecution—neither of which is present here.[12] The teacher-pupil relationship is statutorily defined and is limited to professional employees of a school district.[13] Moreover, the fact that conduct is justified under the penal code does not abolish or impair any remedy for the conduct that is available in a civil suit.[14]

7. *Coons–Andersen v. Andersen,* 104 S.W.3d 630, 635–36 (Tex.App.-Dallas 2003, no pet.).

8. *See In re Martin,* 147 S.W.3d 453, 456 (Tex. App.-Beaumont 2004, orig. proceeding) (holding that child's uncle, who was temporarily responsible for babysitting child, was not entitled to *in loco parentis* status).

9. *See id.* & *supra* n. 5.

10. *See Coons–Andersen,* 104 S.W.3d at 635–36.

11. *See Spacek v. Charles,* 928 S.W.2d 88, 95 (Tex.App.-Houston [14th Dist.] 1996, writ dism'd w.o.j.); *Hogenson v. Williams,* 542 S.W.2d 456, 459–60 (Tex.Civ.App.-Texarkana 1976, no writ) (both involving athletic coaches and students and citing Restatement (Second) of Torts §§ 147, 150–51 (1965)).

12. *See* Tex. Penal Code Ann. § 9.61(b) (Vernon 2003) (providing that adult can stand *in loco parentis* as to child by express or implied consent of child's parents), § 9.62(1) (providing that use of nondeadly force against a person is justified (1) if actor is entrusted with the care, supervision, or administration of the person for a special purpose, (2) when and to the degree actor reasonably believes necessary to further special purpose or to maintain discipline in a group); *see also Snowden v. State,* 12 Tex.Ct.App. 105, 105, 1882 WL 9200, at *2 (1882) (holding that brother who provided home and financial support to his 15–year–old sister could assert *in loco parentis* defense to criminal prosecution for shoving her).

13. *See* Tex. Educ.Code Ann. §§ 22.051, .0511 (Vernon Supp.2004–05).

14. *See* Tex. Penal Code Ann. § 9.06 (Vernon 2003); J. Hadley Edgar, Jr. & James B. Sales, 4 Texas Torts & Remedies § 50.04[1] (2005).

Because appellants did not stand *in loco parentis* as to Laura, the trial court did not err by overruling their requests based on this doctrine. Accordingly, we overrule appellants' first issue.

## Good Samaritan

■ In their second issue, appellants contend that the trial court erred by denying their motion for a directed verdict based on the Good Samaritan statute. This statute provides that a person who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully and wantonly negligent.[15] It is designed to offer protection to persons who voluntarily administer emergency care.[16]

■ Appellants contend that they administered emergency care to Laura because there is evidence that her collapse following the Sunday evening service was due to a hypoglycemic attack. Appellants' position is contradicted, however, by their trial testimony that they moved Laura from the church sanctuary, where she had collapsed initially, to a Sunday School room because they believed her actions were a dramatic ploy for attention from other members of the youth group. Several of the appellants testified that they wanted to remove Laura from the "audience" that was forming in the main sanctuary. Moreover, there is no evidence that

any emergency continued after appellants moved Laura from the sanctuary to the Sunday School room.

In addition, the record does not show that appellants believed the Wednesday evening episode involved an emergency. When McCutchen was summoned on Wednesday evening while Laura was being restrained, he simply put his hand on her forehead, played a tape of music to calm things down, and eventually telephoned her father.

■ A directed verdict is proper only in limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue.[17] We hold that appellants did not conclusively establish their right to a directed verdict based on the Good Samaritan statute.[18] Accordingly, we overrule appellants' second issue.

## Foreseeability of Damages

In their third issue, appellants contend that the trial court erred by denying their request for a directed verdict on the issue of mental anguish and loss of earning capacity damages because there is no evidence that those damages were foreseeable.[19] Alternatively, appellants contend that the trial court erred by refusing to instruct the jury that Laura's damages

15. *See* Act of May 22, 1993, 73rd Leg., R.S., ch. 960, § 1, 1993 Tex. Gen. Laws 4194, 4194 (amended 1999, 2003) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.151(a) (Vernon 2005)).

16. *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 658 (Tex.App.-Dallas 2002, pet. denied).

17. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000); *Ray v. McFarland*, 97 S.W.3d 728, 730 (Tex.App.-

Fort Worth 2003, no pet.); *see also* Tex.R. Civ. P. 268.

18. *Prudential Ins. Co. of Am.*, 29 S.W.3d at 77; *Ray*, 97 S.W.3d at 730.

19. The jury awarded Laura actual damages for past physical pain and mental anguish, past and future loss of earning capacity, and past and future medical care. The damages for past physical pain and mental anguish are not segregated.

were limited to those that were foreseeable.

■ At common law, actual damages are either "direct" or "consequential." [20] In the case of intentional torts such as assault and battery and false imprisonment, the wrongdoer is responsible for the direct and immediate damages resulting from the tort regardless of whether those damages were contemplated, foreseen, or expected.[21] Direct damages, also known as "general" damages, flow naturally and necessarily from the wrong and compensate the plaintiff for the loss that the defendant is conclusively presumed to have foreseen as a result of his wrongful act.[22]

■ Consequential or "special" damages, on the other hand, result naturally but *not* necessarily from the defendant's wrongful acts.[23] Unlike direct damages, consequential damages are not presumed to have been foreseen; instead, they must be premised upon a finding that the damages were proximately caused by the defendant's wrongful conduct.[24]

■ Proximate cause requires proof of foreseeability.[25] An injury is foreseeable if its general character might have been reasonably anticipated.[26] "Even an intentional wrongdoer has no liability for remote consequential injuries that could not have been reasonably anticipated as a probable result of his acts." [27]

■ Mental anguish damages shown to have resulted directly from some types of intentional torts, such as assault and battery, are recoverable regardless of their foreseeability.[28] The rationale for this rule is that the traditionally recognized "problems of foreseeability and genuineness are sufficiently mitigated" because "the high level of culpability [associated with these torts] affects the determination of proximate cause ... and makes it just that the defendant should bear the risk of any overcompensation that an award of mental

**20.** 5 TEXAS TORTS & REMEDIES § 80.01[2] (2005).

**21.** *See Sitton v. Am. Title Co. of Dallas*, 396 S.W.2d 899, 903–04 (Tex.Civ.App.-Dallas 1965, writ ref'd n.r.e.), *cert. denied*, 385 U.S. 975, 87 S.Ct. 501, 17 L.Ed.2d 437 (1966); *Thompson v. Hodges*, 237 S.W.2d 757, 759 (Tex.Civ.App.-San Antonio 1951, writ ref'd n.r.e.).

**22.** 5 TEXAS TORTS & REMEDIES § 80.01[2][a].

**23.** *Id.* § 80.01[2][b].

**24.** *See Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex.App.-El Paso 1992, writ denied) (discussing consequential damages in context of common law fraud cause of action).

**25.** *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *see also Clark v. Waggoner*, 452 S.W.2d 437, 438 (Tex.1970) ("In our State the two elements of proximate cause are cause in fact and foreseeability.").

**26.** *Boys Clubs of Greater Dallas*, 907 S.W.2d at 478; *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex.1985).

**27.** *See Phillips v. Latham*, 523 S.W.2d 19, 27 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.) (holding mental anguish damages too remote to recover on basis of intentional tort claim for civil conspiracy); *Sitton*, 396 S.W.2d at 903–04 (same).

**28.** *See Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967) (holding that "[p]ersonal indignity is the essence of an action for battery"); *Durban v. Guajardo*, 79 S.W.3d 198, 206 (Tex.App.-Dallas 2002, no pet.) (holding that emotional distress is "the essence" of assault claim); *see also Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 372 (Tex.2004) (affirming award of actual mental anguish damages when there was legally sufficient evidence of false imprisonment).

anguish damages in a particular case might entail." [29]

In this case, there is evidence that Laura's mental anguish resulted directly from appellants' intentional acts. Several of Laura's experts, Drs. Roger Pentzien, Arthur Swen Helge, and Millie Carol Astin, testified that Laura suffered from PTSD and major depressive disorder, which were caused by her being held down physically at the church on two occasions in June 1996 when she was exhausted and unable to contact her parents. There is also evidence that Laura's damages for past and future medical care were the natural and necessary result of appellants' wrongful conduct.[30] Dr. Helge tied Laura's need for such medical care directly to her PTSD caused by the June 1996 events.

Because there is evidence that Laura's mental anguish and need for medical care resulted directly from appellant's intentional conduct, appellants are liable to Laura for these damages regardless of whether they were contemplated, foreseen, or expected.[31] Accordingly, the trial court did not err by ruling against appellants regarding these elements of Laura's damages.

We now turn to appellants' complaint about Laura's loss of earning capacity damages.

Unlike her mental anguish damages, Laura's loss of earning capacity damages are consequential or special damages.[32] Therefore, they must be premised upon a finding that they were proximately caused by, and a foreseeable result of, appellants' wrongful conduct.[33] To be held liable for Laura's lifetime loss of earning capacity, appellants must have reasonably contemplated that their actions might have resulted in damages of this general character.[34] This cannot be established by mere conjecture, guess, or speculation.[35]

The evidence supporting Laura's loss of earning capacity damages shows that she could not go to Bible college and become a missionary because of the PTSD she suffered as a result of appellants' intentional actions in holding her down on the floor on two occasions during church functions when she was a junior in high school. Based on these facts, "nothing short of prophetic ken" could have foreseen that Laura would forever lose the ability to pursue a college education and a career as a missionary as a result of appellants' conduct.[36] On the record before us,

---

**29.** *City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997); *see also Fitzpatrick v. Copeland,* 80 S.W.3d 297, 302 & n. 2 (Tex.App.-Fort Worth 2002, pet. denied).

**30.** *See* 5 TEXAS TORTS & REMEDIES § 80.01[2][a].

**31.** *See Sitton,* 396 S.W.2d at 903–04; *Thompson,* 237 S.W.2d at 759.

**32.** *See Weingartens, Inc. v. Price,* 461 S.W.2d 260, 264 (Tex.Civ.App.-Houston [14th Dist.] 1970, writ ref'd n.r.e.) ("Loss of earnings and loss of earning capacity are items of 'special damages.' ").

**33.** *Boys Clubs of Greater Dallas,* 907 S.W.2d at 477; *City of Mesquite,* 830 S.W.2d at 98; *Airborne Freight Corp.,* 847 S.W.2d at 295.

**34.** *County of Cameron v. Brown,* 80 S.W.3d 549, 556 (Tex.2002). Foreseeability does not require that the exact sequence of events that produce an injury be foreseeable, but only that the general character of the damages be foreseen. *Id.; Boys Clubs of Greater Dallas,* 907 S.W.2d at 478; *Nixon,* 690 S.W.2d at 551.

**35.** *Boys Clubs of Greater Dallas,* 907 S.W.2d at 477; *McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex.1980).

**36.** *See Gulf, C. & S.F. Ry. Co. v. Bennett,* 110 Tex. 262, 219 S.W. 197, 198 (1920).

the only way someone could conclude that appellants might have contemplated an injury of such magnitude would be by "viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendants' conduct brings about the injury." [37] A finding of foreseeability requires more than this.[38]

Because there is no evidence that would support a finding that Laura's loss of earning capacity was foreseeable, there is no evidence that appellants' conduct was the proximate cause of Laura's consequential damages for loss of earning capacity.[39] Thus, the trial court erred by denying appellants' motion for a directed verdict and awarding Laura damages for loss of earning capacity.[40]

We sustain appellants' third issue in part and overrule it in part.

## Absence of Malice

■■■ In their fourth issue, Appellants contend that Laura is not entitled to recover mental anguish damages or the resulting expenses for her medical care under *City of Tyler*,[41] because appellants did not act with malice or intend to cause Laura's injuries. Appellants' reliance on *City of*

*Tyler* is, however, misplaced. In *City of Tyler*, the supreme court said, "[M]ental anguish damages are recoverable for some common law torts that generally involve intentional *or* malicious conduct such as … battery." [42] The supreme court did not hold that a plaintiff who has suffered an intentional tort is required to prove malice *in addition* to the defendant's intentional conduct or that the defendant intended to cause the plaintiff's *injury*.[43] Because the jury found the requisite intent to commit the tortious conduct causing Laura's mental anguish and other damages, neither the appellants' good motives nor their erroneous beliefs that they were acting rightfully excuse them from liability.[44]

We overrule appellants' fourth issue.

## Reliability of PTSD Evidence

In their fifth and sixth issues, appellants assert that the trial court improperly admitted certain medical records and expert testimony showing that Laura suffered from PTSD as a result of the events of June 1996. Appellants assert that this evidence lacks the scientific reliability required by *E.I. du Pont de Nemours & Co.*

37. RESTATEMENT (SECOND) OF TORTS § 435(2) (1965).

38. *See Boys Clubs of Greater Dallas*, 907 S.W.2d at 478.

39. *See id.* (holding that when there is no evidence raising a fact issue on foreseeability, there is no evidence to support a finding of proximate cause); *Phillips*, 523 S.W.2d at 26–27 (holding that because there was no competent evidence that plaintiff's illnesses could have been reasonably foreseen, there was no causal relation between defendants' intentional acts and plaintiff's injuries).

40. Because there is no evidence to support a finding that Laura's loss of earning capacity damages were proximately caused by appellants' conduct, we do not reach appellants'

alternative issue regarding whether the trial court erred in failing to submit a separate damages question asking whether Laura's loss of earning capacity was proximately caused by appellants' conduct.

41. 962 S.W.2d at 489.

42. *Id.* at 495 (emphasis supplied); *accord Fitzpatrick*, 80 S.W.3d at 302 & n. 2 (noting that mental anguish damages are recoverable for intentional tort of battery because legal concerns regarding foreseeability and legitimacy of injury are satisfied).

43. *City of Tyler*, 962 S.W.2d at 495.

44. *See* DAN B. DOBBS, THE LAW OF TORTS § 25, at 49–50 (2001).

*v. Robinson*[45] and the Texas Rules of Evidence.[46] In particular, appellants argue that the expert opinions of Drs. Roger Pentzien, Arthur Swen Helge, and Millie Carol Astin are based on unreliable data because virtually all of the information was provided by Laura or her family, whom the record shows to be prone to exaggeration and fabrication. Appellants also contend that the opinions are unreliable because the experts failed to rule out Laura's traumatic childhood experiences in Africa as a possible cause of her PTSD.[47]

■ If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise.[48] A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation.[49]

■ To gauge reliability, the trial court must evaluate the methods, analysis, and principles relied upon in reaching the opinion.[50] The trial court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.[51] In determining reliability, however, the trial court does not decide whether the expert's conclusions are correct, but only whether the analysis used to reach those conclusions is reliable.[52]

■ If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on the data because any opinion drawn from that data is likewise unreliable.[53] Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions

---

45. 923 S.W.2d 549 (Tex.1995).

46. Appellants also complain in passing that this evidence was inadmissible because it was not based on a reasonable medical probability. We do not address this complaint because it is not briefed. *See* Tex.R.App. P. 38.1(h).

47. The record contains conflicting evidence concerning whether Laura's experiences in Africa were traumatic. Some of Laura's medical records indicate that she had seen "traumatic events" such as "beatings and burnings" while her family lived as missionaries in Africa. The record is unclear, however, whether these records are based on Laura's or Tom Schubert's recounting of events. Also, Tom authored two letters in 1992 and 1996, respectively, regarding the family's alleged experiences in Africa that indicated Laura had faced "fear and danger in Africa" that "was more than any child should ever see or face." Tom testified at trial, however, that he had exaggerated in the letters "almost to the point of lying"—once to obtain leave from Africa from the mission board due to his children's difficulties in school and another to

emphasize how the events of June 1996 had hurt Laura more deeply than her experiences in Africa. Laura denied having suffered any traumatic experiences in Africa and testified instead that Africa was "an amazing place" where she would prefer to raise her daughter.

48. Tex.R. Evid. 702.

49. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001); *Robinson,* 923 S.W.2d at 556.

50. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002); *Gammill v. Jack Williams Chev., Inc.,* 972 S.W.2d 713, 725 (Tex.1998).

51. *Helena Chem. Co.,* 47 S.W.3d at 499; *Gammill,* 972 S.W.2d at 725–26.

52. *Exxon Pipeline Co.,* 88 S.W.3d at 629; *Gammill,* 972 S.W.2d at 728.

53. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997).

from the data based on flawed methodology.[54]

■ The supreme court has crafted two approaches for determining whether expert testimony is reliable: the *Robinson* factors and the *Gammill* analytical gap test.[55] Only the *Robinson* factors are at issue here. These factors include, but are not limited to (1) the extent to which the theory has been or can be tested, (2) the extent to which the technique relies upon the subjective interpretation of the expert, (3) whether the theory has been subjected to peer review and/or publication, (4) the technique's potential rate of error, (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and (6) the nonjudicial uses that have been made of the theory or technique.[56] Expert testimony that is based on research the expert has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.[57]

■ The trial court has broad discretion to determine admissibility, and we will not reverse the trial court's ruling absent a clear abuse of that discretion.[58] A trial court abuses its discretion only if it acts arbitrarily and capriciously, without reference to any guiding rules or principles.[59] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[60]

The evidence concerning the reliability of Dr. Helge's, Dr. Astin's, and Dr. Pentzien's expert testimony is as follows.

■ Dr. Helge, a clinical and forensic psychologist, had over twenty-five years' experience diagnosing mental diseases and disorders and had conducted seminars and published articles related to his profession. He had also testified at more than two hundred trials and given over a hundred depositions.[61] Dr. Helge opined that Laura suffered from a dependent personality disorder[62] and that her being touched and held down against her will on the two occasions in June 1996 when she was exhausted and not able to contact her parents were the cause of her PTSD.

Dr. Helge conceded that Laura or her family had been the source of all the information he had relied upon in making these diagnoses, either through their self-reporting to him or other mental health professionals, or Laura's responses to the tests that he had conducted. But Dr. Helge testified that this was "the way it's normal-

---

54. *Id.*

55. *Gammill,* 972 S.W.2d at 720, 726.

56. *Robinson,* 923 S.W.2d at 557.

57. *Id.* n. 2.

58. *Exxon Pipeline Co.,* 88 S.W.3d at 629; *Helena Chem. Co.,* 47 S.W.3d at 499; *Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 410 (Tex.App.-Fort Worth 2003, no pet.).

59. *See Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

60. *Downer,* 701 S.W.2d at 242.

61. Appellants do not challenge the qualifications Drs. Helge and Pentzie. Instead, appellants acknowledged that these doctors were qualified as experts and also designated them as their own experts regarding certain of their diagnoses concerning Laura.

62. According to Dr. Helge, a dependent personality is one that trusts another person's judgment, rather than her own, particularly when under stress.

ly done" in the psychological community and pointed out that he had also reviewed Laura's medical records and relied on the expertise of the other experts who had interviewed her. Moreover, Dr. Helge testified that he had conducted standard psychological testing on Laura, along with a Psychiatric Diagnostic Interview (PDI–R) and a clinical interview, which were consistent with the standard and practice for clinical psychology.

Dr. Helge also listed seven specific tests that he had performed on Laura. According to Dr. Helge, the tests had been subjected to peer review, published in professional literature, accepted as valid testing instruments within the psychological community, and used in court situations. Several of the tests had been used and revised since the 1950s; others were introduced in the 1980s. He relied on the results from four of these tests, the MMPI–II, MCRI, TAT, and TSI,[63] along with the PDI–R and Laura's medical records from other doctors, in making his diagnoses.

Dr. Helge explained that, while psychological testing does not identify the specific incidents that caused a person's PTSD, the tests do identify the fact that an event traumatic to an individual occurred and its characteristics. For example, Dr. Helge testified that the TAT tests a person's feelings or attitudes about certain situations, and the TSI determines sources of situations in which the person expresses

unusual symptoms of trauma at a point in time. Further, Dr. Helge explained that, although there is always a measure of subjective interpretation associated with the tests he conducted, the tests also involved objective data with objective norms.

Dr. Pentzien, a practicing neuropsychiatrist with twenty-six years' experience, also diagnosed Laura as suffering from PTSD and major depressive disorder caused by the events of June 1996. Dr. Pentzien opined that nothing that had happened in Laura's life before the June 1996 events, including the Schubert family's experiences in Africa,[64] would have caused these disorders. Dr. Pentzien stated that, due to Laura's conflicting recounting of her history, he would want to see more information before rendering an opinion for the jury to base its verdict on. But he further testified that the rate of error for the methodology he had used in making his diagnoses was one in ten thousand, which is generally accepted throughout the scientific community as reliable.

Dr. Astin had eight years of experience as a clinical psychologist. She specialized in trauma disorders such as PTSD, had authored articles and book chapters on PTSD, had taught courses on the psychology of victims and the assessment of PTSD, and had made numerous conference presentations on PTSD.[65]

In May 2001, Dr. Astin diagnosed Laura as suffering from PTSD and major depres-

---

63. These tests are the Minnesota Multiphasic Personality Inventory–2, Millon Clinical Multiaxial Inventory–III, Thematic Apperception Test, and Traumatic Symptom Inventory, respectively.

64. Dr. Pentzien believed Tom Schubert had embellished the family's situation in Africa because he was concerned about Laura's lack of adjustment. Dr. Pentzien also discounted Laura's Africa experiences as a source of her PTSD because she had adjusted well academically, socially, and physically and had

behaved "totally independently" after the family's return to the United States in late 1992, about three-and-a-half years before the June 1996 incidents.

65. Although they did not object to Dr. Astin's qualifications at trial, appellants assert that her testimony is not reliable because her credentials are suspect. Appellants' attacks on Dr. Astin's credentials are not supported by the record.

sion. She testified that these diagnoses had not changed after twenty-five treatment sessions and additional testing. Although she was aware of Laura's experiences in Africa and was of the opinion that "horrible experiences" in a person's childhood could affect her later in life, Dr. Astin opined that the cause of Laura's PTSD and depression was related to the June 1996 incidents.

Dr. Astin testified that, in making her diagnoses, she had administered several standardized tests to Laura that are generally accepted as valid in the field of psychology for determining whether a person is suffering from PTSD and depression, and if so, with what intensity.

Further, Dr. Astin acknowledged that much of the information she used in making her PTSD diagnosis had been provided by Laura herself. But Dr. Astin listed several methods that she used to ensure that Laura—or any other patient—was not "pulling the wool over her eyes." First, Dr. Astin relied on her clinical skills and experience. She also asked Laura to give her detailed descriptions of each of the symptoms Laura claimed to be having related to PTSD and depression (such as flashbacks, for example), so that she could determine whether Laura was actually experiencing the symptoms.

Dr. Astin explained that she had done extensive PTSD research and knew from experience that a lot of people wanted to participate in research studies for financial gain. According to Dr. Astin, these people would "overendorse," or report very high PTSD symptom levels that were inconsistent with their behavior. Over time, Dr. Astin examined these individuals' detailed, repeated self-reporting about their alleged symptoms and behavior to see if they were

consistent with PTSD. If, based on her extensive clinical training and experience, she determined that a particular patient was overendorsing symptomology consistent with PTSD, but was not actually suffering from it, she would reject the patient from her research studies. She followed the same process with Laura during twenty-five visits and, as a result, "had no sense" that Laura was trying to lie.

Finally, in addition to a regular clinical interview, Dr. Astin conducted a standardized clinical interview, known as CAPS,[66] that, in a "very structured way" required her patients, including Laura, to provide specific, detailed information regarding each of the seventeen possible criteria for PTSD listed in the DSM–IV.[67] She explained that the standardization meant that every clinician who administered CAPS to a patient conducted it according to the same format, thereby enabling clinicians to better determine the validity of the responses received and lending greater credence to their resulting diagnoses. Dr. Astin stated that CAPS had been developed in the 1980s as a result of research on potential PTSD sufferers by nationally and internationally known experts and peer-reviewed by experts in PTSD and trauma, some of whom had also written the DSM–IV. Dr. Astin stated that trauma experts considered CAPS to be "state-of-the art" and the "gold standard" for diagnosing PTSD or eliminating it as a diagnosis.

Appellants assert that Dr. Astin's methodology was not reliable because it was "unusual" and "quite strange." To support their position, appellants assert that Dr. Astin employed "an unusual form of clinical practice" that most mental health professionals do not recognize: Eye Move-

66. CAPS stands for Clinician Administered PTSD Scale.

67. The DSM–IV is the Diagnostic Statistical Manual, 4th Revision.

ment Desensitization and Reprocessing (EMDR). Appellants also assert that Dr. Astin admitted she had treated so many traumatized women that she had been "vicariously traumatized" herself and experienced PTSD symptoms. Based on our review of the record, we cannot agree with appellants' characterization of Dr. Astin's methodology.

First, there is no evidence that Dr. Astin employed EMDR in *diagnosing* Laura's condition; instead, Dr. Astin testified that she had used this and other techniques in *treating* Laura. Dr. Astin testified that EMDR is a therapy technique that involves asking a person to bring up some aspect of a traumatic memory, along with the negative thoughts that have developed as a result of it, while watching the therapist's fingers move back and forth in front of the patient's eyes. Dr. Astin's personal opinion, however, was that the eye movements were just a way to distract the person while thinking about the trauma, therefore making it less aversive to do so.

Dr. Astin further testified that EMDR was generally accepted in the scientific community, but remained controversial because the inventor of the technique was a controversial person. She explained that there had been little good research on EMDR at first, but that seven recent, "very well controlled studies" had shown EMDR to be highly effective. As a result, this technique had been endorsed, although not promoted, by the Society for Traumatic Stress Studies[68]—a well-respected organization of mental health providers, including psychologists and psychiatrists, and "virtually all" of the members of the national centers for

PTSD established by the federal government. Dr. Astin testified that large numbers of clinicians were now using it, and she provided the trial court with two articles about EMDR that explained why it was valid. Regarding vicarious traumatization, Dr. Astin acknowledged that, early in her career, she had experienced symptoms of this phenomenon, which is well recognized in the field of psychology. Dr. Astin testified that, several years before Laura became her patient, she had written an article about her experiences. She also testified that she had recognized how to prevent these feelings and symptoms, no longer had them, and had never been treated for them. Finally, Dr. Astin testified that vicarious traumatization had not affected her diagnosis of Laura in any way.

Despite all of this evidence of reliability, appellants assert that these experts' testimony concerning Laura's PTSD diagnosis is unreliable because the experts made the diagnosis without conducting any rate-of-incidence studies or objective medical tests, such as imaging technology or blood work, or reviewing results of similar cases of restraint. Appellants further assert that Laura's MMPI–II score showed she was "faking bad," that is, exaggerating her symptoms.

Appellants do not direct us to any expert testimony that these tests should have been conducted or would have assisted in a determination of the cause of Laura's PTSD.[69] Further, regarding rate-of-incidence studies, Dr. Helge testified that he did not know of any case studies examin-

---

68. Dr. Astin explained that "endorsing" meant STSS had concluded there was good evidence EMDR was effective, while "promoting" would have including prompting from STSS to use the treatment.

69. *See* Tex.R.App. P. 38.1(h); *Hall v. Stephenson*, 919 S.W.2d 454, 466 (Tex.App.-Fort Worth 1996, writ denied) (both providing that appellant has duty to provide appellate court appropriate citations to record).

ing the incidence of PTSD arising from Laura's type of situation.

Regarding medical tests, Dr. Pentzien testified that a blood test and neuroimaging technique were available to serve as additional tools in diagnosing mental disorders. He further testified, however, that the tests had not been conducted because they were not specific enough to distinguish between particular types of disorders. In addition, Dr. Pentzien testified that the neuroimaging technique was not sufficiently standardized to be generally accepted as reliable in the field of neuropsychiatry. Likewise, Dr. Astin testified that she knew of no literature in the field of psychotherapy that suggested a blood test or brain scan could be specific enough to reveal PTSD.

Drs. Astin and Helge conceded that Laura's MMPI–II score showed she was "faking bad." But they interpreted Laura's particular score as consistent with a "cry for help," meaning that she was embellishing her symptoms somewhat in order to be heard, not that she was claiming to have symptoms that did not exist. Dr. Pentzien testified that, while he considered the MMPI–II helpful in making a diagnosis, he was not trained in the field of psychometrics[70] and therefore was not qualified to interpret the MMPI–II test results.

Having conducted a careful review, we conclude that, although the record shows that the methods and analyses that Drs. Helge, Astin, and Pentzien relied upon in formulating their diagnoses involved some subjective interpretation, the record also shows that these methods and analyses had a rate of error generally accepted in the scientific community as reliable, had been accepted as valid in the scientific community for decades, had been subject to extensive peer review and publication, and had been widely used for nonjudicial purposes.[71] Accordingly, we hold that the trial court did not abuse its discretion by concluding that these experts' opinion testimony was reliable and therefore admissible.[72]

We overrule appellants' fifth and sixth issues.

### First Amendment

■ In their seventh and eighth issues, appellants complain that the trial court erred by failing to give them the benefit of certain protections against Laura's claims under the First Amendment of the United States Constitution.[73] Specifically, appellants contend that a clear and convincing proof of malice requirement similar to that which the United States Supreme Court has applied to libel actions under the Free Speech Clause should be applied to Lau-

---

70. Psychometrics is the testing and interpretation of psychological tests.

71. *See Robinson,* 923 S.W.2d at 557.

72. *See Carpenter,* 98 S.W.3d at 687; *Exxon Pipeline Co.,* 88 S.W.3d at 629; *Helena Chem. Co.,* 47 S.W.3d at 499; *Downer,* 701 S.W.2d at 241–42. In light of this holding, we need not consider appellants' complaint that the trial court summarily overruled their objection to the admission of Laura's medical records from nontestifying experts regarding their PTSD diagnoses. Such evidence, even if improperly admitted, would have been cumula-

tive and would not have caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a).

73. The Free Exercise Clause to the First Amendment provides, "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. Appellants also assert a claim under the Free Worship Clause, article I, section 6 of the Texas Constitution, but they do not argue that the Texas Constitution affords them different or greater protection than the First Amendment.

ra's claims[74] and that the judgment against them should be reversed because the evidence conclusively establishes that they did not act with malice. In the alternative, appellants assert that the case should be remanded for a new trial because the trial court erred in refusing to submit jury instructions on the issue of malice and the clear and convincing evidentiary standard.

▮ In a prior original proceeding, appellants sought, based on the First Amendment, a writ of mandamus ordering the trial court to dismiss all of the "religious" claims that had been brought by Laura and her parents.[75] In the same proceeding, appellants requested that we allow Laura's claims for assault and battery and false imprisonment "to go forward" because, in the words of appellants' attorney of record and Reverend McCutchen stated under oath, these claims constitute "a 'secular controversy' and do[ ] not come within the protection of the First Amendment." Appellants averred that "no church or pastor can use the First Amendment as an excuse to cause bodily injury to any person," and represented that "no religious beliefs would be implicated" if Laura's "pure 'bodily injury'" claims of assault and battery and false imprisonment were litigated.[76]

We granted the relief appellants requested and held that all of the challenged "religious" claims were barred by the First Amendment.[77] Thereafter, trial proceeded on Laura's assault and battery and false imprisonment claims with all of the appellants' acquiescence.[78]

---

**74.** *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 763, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (indicating that damages in defamation cases involving matters of public concern are not presumed absent showing of actual malice); *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 726, 729, 11 L.Ed.2d 686 (1964) (applying actual malice and heightened evidentiary standard to free speech cases involving governmental officials); *see also Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000) (applying same to public figures). Malice is not an element of the intentional torts of assault and battery or false imprisonment under current Texas law. *See Wal–Mart Stores v. Rodriguez,* 92 S.W.3d 502, 506 (Tex. 2002); *Baribeau v. Gustafson,* 107 S.W.3d 52, 60 (Tex.App.-San Antonio 2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 272, 160 L.Ed.2d 118 (2004); *Green v. Indus. Specialty Contractors, Inc.,* 1 S.W.3d 126, 134 (Tex. App.-Houston [1st Dist.] 1999, no pet.).

**75.** *See In re Pleasant Glade Assembly of God,* 991 S.W.2d 85, 87–88 (Tex.App.-Fort Worth 1998, orig. proceeding).

**76.** Appellants have asked us to take judicial notice of our records in the original proceeding. A court may take judicial notice of its own records, *see Brown v. Brown,* 145 S.W.3d 745, 750 (Tex.App.-Dallas 2004, pet. denied), and such notice is mandatory if a party requests it and supplies the necessary information. *See* Tex.R. Evid. 201(d).

**77.** *Pleasant Glade Assembly of God,* 991 S.W.2d at 87, 90.

**78.** For example, before trial began, appellants' counsel responded "Okay" to the trial court's ruling that neither side would be allowed to put on evidence about appellants' religious practices as a reason for Laura's restraint. The trial court also instructed the jury at the beginning of trial that, because the suit involved a church, the First Amendment would bar the parties from explaining why certain things were said and done during the June 1996 incidents. Appellants did not object to this instruction. Likewise, when the trial court instructed various witnesses not to mention religious matters, such as prayer, or instructed the jury to disregard testimony concerning religious matters, appellants did not object to these rulings. In addition, at appellants' request, the trial court instructed one of Laura's expert witnesses to refrain from referring to all issues of faith or religious activity that may have been connected with the June 1996 incidents.

 Having obtained, in the prior mandamus proceeding, the dismissal of all but Laura's assault and false imprisonment claims, which they swore under oath should "go forward" because they were purely secular and entitled to no First Amendment protections, appellants cannot now "play fast and loose" with the judicial system by taking the opposite position in this appeal to suit their own purposes.[79] We therefore hold that the church and pastors are estopped [80] from asserting in this appeal that they are entitled to First Amendment protections with regard to Laura's assault and false imprisonment claims. Accordingly, we overrule appellants' seventh and eighth issues.[81]

### Course and Scope of Employment

In their ninth and tenth issues, appellants contend that the trial court erred in concluding, as a matter of law, that McCutchen and Rod Linzay were acting in the scope and course of their employment during the June 1996 incidents. Appellants assert that rendition of judgment against the church absent a jury finding on this issue was improper.

Appellants have not briefed these issues.[82] Further, appellants admit that McCutchen and Linzay "were in the course and scope of their work for the Church during the times in question." Therefore, we overrule appellants' ninth and tenth issues.

**79.** *Andrews v. Diamond, Rash, Leslie & Smith,* 959 S.W.2d 646, 649 (Tex.App.-El Paso 1997, pet. denied); *see also Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292, 295 (1956).

**80.** Whether appellants' actions are labeled as waiver or judicial estoppel is immaterial. *See Jernigan v. Langley,* 111 S.W.3d 153, 156–57 (Tex.2003) (noting that waiver is defined as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right"); *Long,* 291 S.W.2d at 295 ("Under the doctrine of judicial estoppel ... a party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary to the assertion sought to be made."). What is clear is that courts, faced with burgeoning dockets, are entitled to rely on prior sworn statements of parties and counsel such as those in this case. *See Ergo Sci. Inc. v. Martin,* 73 F.3d 595, 599–600 (5th Cir.1996); *see also Cleaver v. Cleaver,* 140 S.W.3d 771, 774–75 (Tex.App.-Tyler 2004, no pet.) (stating that, under federal law, judicial estoppel does not require a prior sworn statement, but only that party successfully maintained an affirmative position in a prior proceeding that is contrary to the position it now seeks to invoke).

**81.** On rehearing, Smith, Bickel, and Patterson (collectively, the church members) argue that they are entitled to First Amendment

protection because they did not participate in the prior mandamus proceeding. The church members have, however, waived their right to assert this affirmative defense because they did not establish in the trial court that their assault and imprisonment of Laura was based on their sincerely held religious beliefs. *See Tilton v. Marshall,* 925 S.W.2d 672, 677–78 (Tex.1996) (orig.proceeding) ("Before a court can determine whether a law ... substantially burdens one's free exercise rights [and entitles the person to First Amendment protection], the individual must establish by a preponderance of the evidence that the beliefs avowed are not only religious in nature, but sincerely held."). To the contrary, the church members each testified that their conduct arose from their belief that Laura's actions were a ploy for attention from other members of the youth group. The church members' reliance on McCutchen's pretrial affidavit concerning some of their denomination's religious beliefs is misplaced. The affidavit does not establish by a preponderance of the evidence that the church members themselves sincerely held those beliefs or that their conduct in this case was based on those beliefs. *See id.*

**82.** *See Fredonia State Bank v. Gen. Am. Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994) (noting long-standing rule that point may be waived due to inadequate briefing).

## Conclusion

Having disposed of all of appellants' issues, we reverse the trial court's judgment awarding Laura $122,000 in damages for loss of earning capacity and render judgment that she take nothing on this damages claim. We affirm the remainder of the trial court's judgment.

LIVINGSTON, J., dissents in part without opinion as to issue three.